## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————————————

OSCAR P. C.,                      :
                                  :
              Petitioner,         :        Civ. No. 20-5622 (KM)
                                  :
      v.                          :
                                  :
JOHN TSOUKARIS, *et al.*,         :        **OPINION**
                                  :
              Respondents.        :
—————————————————————————————     :

## KEVIN MCNULTY, U.S.D.J.

## I.        INTRODUCTION

Petitioner, Oscar P. C.,[1] is an immigration detainee currently held at the Essex County Correctional Facility in Newark, New Jersey. He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) He separately filed a motion for a temporary restraining order ("TRO") which seeks his immediate release from detention. (DE 3.) Respondents oppose the petition and motion. (DE 13.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition and motion will be denied. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

---

[1]        Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II.     BACKGROUND

**A.     COVID-19 Pandemic**

This past March, the World Health Organization declared COVID-19 a global pandemic. *See* Ctrs. for Disease Control and Prevention, *CDC's Response to COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/index.html (last visited June 8, 2020). COVID-19 is a rapidly spreading infectious disease which attacks the respiratory system. *See* Ctrs. for Disease Control and Prevention, *Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last visited June 8, 2020). The virus spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 8, 2020). However, even individuals who are asymptomatic may be able to spread the virus. *See id.*

To prevent contracting COVID-19, the Centers for Disease Control and Prevention ("CDC") recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited June 8, 2020). The CDC has also identified certain groups of individuals who are deemed to be at "higher risk for severe illness" if they contract COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-

higher-risk.html (last visited June 8, 2020). These high risk individuals include, but are not limited to, those who are over 65 years of age, have asthma, or are immunocompromised. *See id.*

While my focus is of course on conditions within ECCF, *see infra,* I note that overall trends in New Jersey are sharply downward. New COVID cases peaked at 4,391 on April 15, 2020. *See* New Jersey COVID-19 Information Hub, https://covid19.nj.gov/#Live-updates (last visited June 8, 2020). On June 6, 2020, 356 new cases were reported. *See id.* The seven-day averages flatten out the spikes and troughs in the data but confirm the downward trend.  *See* N.Y. Times, *New Jersey Coronavirus Map and Case Count*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited June 8, 2020). Hospitalizations, too, are down 67% from their April 15 peak. *See* New Jersey COVID-19 Information Hub, https://covid19.nj.gov/#Live-updates (last visited June 8, 2020).

Essex County, as of June 8, 2020, has reported 18,077 positive test results, and 1,707 deaths (cumulative, since the onset of the crisis). *See* N.Y. Times, *New Jersey Coronavirus Map and Case Count*,  https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html   (last visited June 8, 2020). Essex County's two-week change-in-cases trend has been steadily falling since the April peak. *See id.* These figures, while not specific to the ECCF, are at least indirectly relevant; I discuss the ECCF figures below.

**B.    Background**

*i.    Procedural History*

Petitioner is a 46-year-old native and citizen of Guatemala. (DE 1-2 at 2.) He entered the United States on November 4, 2015, pursuant to a B-2 tourist visa. (DE 13-7 at 3.) He was authorized to remain in the United States only until May 3, 2016. (*Id.*) Petitioner has overstayed his visa and remained in the United States since his 2015 arrival. (*Id.*; DE 1-2 at 2.)

Petitioner has no criminal history in the United States. (DE 13-7 at 4.) However, there is an INTERPOL "Red Notice" for Petitioner, which indicates that he is wanted by authorities in Guatemala for the alleged rape of a minor in 2015. (DE 13-8 at 2–3.) A Red Notice is "not an arrest warrant," but rather, an "international wanted persons notice." *See* INTERPOL, *Red Notices*, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited June 8, 2020).

On May 13, 2019, Petitioner was apprehended and taken into the custody of Immigration and Customs Enforcement ("ICE"). (*Id.* at 4.) He was served with a Notice to Appear, charging him with removability for overstaying his visa and placing him into removal proceedings. (DE 13-9.) Petitioner has been detained at Essex County Correctional Facility ("ECCF") since that time, pursuant to ICE's discretionary authority under 8 U.S.C. § 1226(a). (DE 13 at 15, 24.)

After being taken into custody, Petitioner received a bond hearing; release on bond was denied. (DE 13-10.)[2] On October 29, 2019, an Immigration Judge ("IJ") ordered Petitioner removed from the United States. (DE 13-12 at 2.)[3] Petitioner has appealed the IJ's decision and the matter remains pending before the Board of Immigration Appeals ("BIA"). (*Id.*; DE 13-13.)

On May 6, 2020, Petitioner filed this habeas petition pursuant to 28 U.S.C. § 2241. (DE 1.) He concurrently filed a motion for a temporary restraining order. (DE 3.) Petitioner seeks immediate release from custody based on allegedly unconstitutional conditions of

---

[2]   At some point, it appears that Petitioner made a motion for a change in custody status. (DE 13-4.) On March 12, 2020, the request was denied. (*Id.*) On May 6, 2020, Petitioner also submitted a request for humanitarian parole or release to the Department of Homeland Security ("DHS"). (DE 13-12.) DHS denied that request on May 11, 2020. (*Id.*)

[3]   It appears that Petitioner is pursuing relief as an asylum seeker. (DE 14 at 13; DE 1-2 at 2.)

confinement. (DE 1 at 32–33.) On May 15, 2020, Respondents filed opposition to the petition and

motion. (DE 13.)[4] Petitioner thereafter filed a reply. (DE 14.)

ii.      *Petitioner's Health*

Petitioner suffers from type-2 diabetes, diabetic neuropathy, and hyperlipidemia, as well

as chronic back and leg pain. (DE 1 at 2.) Petitioner's medical records confirm, and Respondents

do not deny, that Petitioner has been diagnosed with these conditions. (*See generally* DE 2; DE 13

at 17.) Petitioner provides the declaration of Dr. Robert Greifinger, who reviewed Petitioner's

medical records and opines that Petitioner's well documented diabetes places him at "high risk for

severe complications or death from COVID-19." (DE 1-4 at 5–6.)

On April 24, 2020, Petitioner received a "COVID-19 related rapid antibody test." (DE 13

at 17.)[5] His test results came back as positive for the presence of both IgM and IgG antibodies.

(*Id.*) According to the ECCF Medical Director, this test result indicates that an individual "may be

COVID-19 positive, still fighting off the novel virus (+ IgM reading) and developing immunity

(+ IgG reading). The individual can be either asymptomatic or symptomatic." (DE 13-6 at 6.)

Respondents state that after Petitioner's test results came back as positive, he was placed in

quarantine for two weeks, monitored by staff, and ultimately cleared to return to the general

population. (DE 13 at 30.)

Petitioner disputes the reliability of these test results, arguing they are inadequate to

determine whether he has ever been exposed to or infected by COVID-19. (DE 14 at 12.) In

support, he provides the declaration of Dr. Jamie Meyer, who is board certified in Internal

---

[4]      Respondents also provided supplemental submissions on May 20, 2020 and June 4, 2020. (DE 15; DE 18.)
[5]      Although Respondents allege this information is contained in Petitioner's medical records, this information is not contained in the records provided to the Court. (*See generally* DE 2.) Petitioner does not appear to deny it, however. (*See* DE 14 at 8–12.)

Medicine, Infectious Diseases, and Addiction Medicine. (DE 1-15.) Dr. Meyer states that antibody tests are prone to both false positive and false negative results; they are unable to determine whether an individual is immune to COVID-19; and they are not indicative of whether an individual has or had COVID-19. Dr. Meyer states that an individual, for various reasons, may test positive for the presence of antibodies despite never having had COVID-19. (*Id.* at 6.) Also uncertain, according to Dr. Meyers, is the proposition that a person, once infected with COVID-19, will thereafter be immune. (*Id.*) Quoting the head of the World Health Organization's emerging disease and zoonosis unit, Dr. Meyer states, "we have no evidence that the use of [an antibody] test can show than an individual is immune or protected from reinfection." (*Id.*) Moreover, Dr. Meyer indicates that the antibody test only measures the immune response to the virus and does not actually look for the virus itself. (*Id.* at 7.) Thus, "an antibody test still cannot tell us whether or not someone actually has the virus or is contagious to others." (*Id.*) Dr. Meyer warns of the grave danger in using antibody tests to diagnosis COVID-19, as the results may misclassify people "as having (or not having) active disease, as being (or not being) contagious to others, and as being (or not being) protected from reinfection." (*Id.* at 7–8.)

Petitioner also provides the declaration of Dr. Elizabeth Singer, who is board certified in Emergency Medicine. (DE 1-6.) Dr. Singer similarly warns of the serious limitations of antibody testing. (*Id.* at 12–14.) According to Dr. Singer, the research demonstrates that antibody tests have a reliability rate as low as 20 or 30 percent, which often results in false positive and false negative tests. (*Id.* at 13.) She states that, "[f]or this reason, the World Health Organization has cautioned that [antibody tests] should be used only in research settings, and not for clinical decision-making." (*Id.*)

C. **Conditions at ECCF**

    i.   *Respondents' Evidence Regarding the Conditions at ECCF*

To describe the measures ECCF has implemented to combat the spread of COVID-19, Respondents provide the Tenth Amended Declaration of Alfaro Ortiz, the Director of ECCF, dated May 18, 2020. (DE 15-1.) Mr. Ortiz states that since March 2020, ECCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 4.) The protocols are lengthy and detailed, and I summarize them only briefly.

ECCF is now at approximately 67% of its capacity. Each ICE detainee housing unit holds approximately 48 people (reduced from the usual 60), and each cell within the housing unit contains two bunk beds. (*Id.* at 2.) The bunks are not, however, spaced six feet apart. (*Id.*) The cells are located around the perimeter of the housing unit and in the center of the unit there is a seating area and recreation area. (*Id.*) The spacing within the units allows for detainees to practice social distancing to some degree. (*Id.*)

Since the COVID-19 outbreak, meals have been brought to detainees within their cells or in the recreation area of the housing unit. (*Id.* at 6.) ECCF has modified recreation groups to limit close interaction with other detainees and has reduced the number of individuals permitted to take recreation at the same time. (*Id.* at 8.) The facility has also educated detainees, in multiple languages and formats, about COVID-19 and best practices to prevent the spread of the virus. (*Id.* at 5, 11.) There are signs posted throughout the facility, public service announcements are played on video screens, and live and video presentations are given about COVID-19. (*Id.* at 2, 11.) Outside visits have been severely curtailed.

ECCF has hired additional staff to increase the cleaning and sanitizing of their facility. (*Id.* at 6.) Each housing unit is sanitized "no less than three times per day." (*Id.*) The common spaces

and equipment are regularly sanitized, and communal telephones and tablets are cleaned between uses by a "designated detainee" who is supervised by ECCF staff. (*Id.* at 10.) Cleaning agents are available in the communal showers to detainees to clean the areas themselves between uses. (*Id.* at 11.)

For safety reasons, the facility does not provide hand sanitizer to detainees. (*Id.* at 9.) However, detainees have "free access to soap." (*Id.* at 9.) Despite allegations from some detainees that there is insufficient soap and disinfectant, Mr. Ortiz states, "[t]hat is not true." (*Id.* at 13.) Detainees have unlimited access to soap and water, and some detainees keep multiple bars of soap in their personal area. (*Id.* at 13–14.) ECCF receives deliveries of soap every three days and detainees are permitted to have four or five bars of soap at a time. (*Id.* at 14.) The facility is encouraging detainees to use soap as frequently as possible and individuals can request additional soap at any time. (*Id.*) Disinfectant spray is available for detainees to use upon request. (*Id.* at 14.) Since disinfectant spray contains bleach, and therefore can be a safety hazard, detainees cannot keep the disinfectant spray with them. (*Id.*) However, at the beginning of each correctional officer's shift, they are issued a bottle of disinfectant spray to use throughout their shift. (*Id.* at 15.) The spray bottle is replenished as necessary and ECCF is encouraging staff and detainees to use the spray often and liberally. (*Id.*)

As for medical care, ECCF is following the testing guidance issued by the CDC. (*Id.* at 11.) Detainees who complain of illness are "immediately evaluated by medical staff." (*Id.*) If a detainee exhibits signs or symptoms of COVID-19, they are provided with a surgical mask. (*Id.*) Individuals with moderate to severe symptoms are transported to the local hospital for evaluation. (*Id.* at 11–12.) Individuals with mild symptoms are placed in a designated quarantine area and isolated from others. (*Id.*) Anyone who is symptomatic and awaiting test results are started on anti-

viral medications and their vitals are monitored on a daily basis. (*Id.* at 12–13.) Detainees who are asymptomatic but have been exposed to someone with confirmed COVID-19, are housed together in a practice referred to as "cohorting." (*Id.* at 13.) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) Any detainees with health conditions identified by the CDC as placing them at higher risk of developing serious illness of COVID-19 are being housed separately. (*Id.* at 17.) However, individuals with chronic conditions, "such as diabetes, that are well-controlled remain in the general population." (*Id.* at 17.) All staff members are provided with a surgical mask and gloves when they report to work. (*Id.* at 9.)

Mr. Ortiz states that although there is no mandate for testing the entire ECCF population. The facility is in the process of testing the entire detainee and inmate population using rapid testing antibody screening, so more and more are being tested. (*Id.* at 17.) This test is a "supplementary screening tool done through a blood test[.]" (*Id.*) Detainees are housed based upon the results of their antibody test. (*Id.*)

Mr. Ortiz's Eighth Amended Declaration states that as of May 16, 2020, the following had tested positive for COVID-19: 3 ICE detainees; 10 County inmates in Delaney Hall COVID housing, plus 5 in non-COVID housing; 87 correctional staff members; and 4 civilian staff members. (*Id.* at 16.)[6]

Mr. Ortiz's Declaration is amended regularly. Respondents have just submitted the Tenth Amended version of that declaration, dated June 1, 2020, containing updated information, particularly with respect to COVID tests at ECCF. (DE 18-1.) As of May 31, 2020, the following had tested positive: (a) 8 ICE detainees; (b) 2 county inmates (one released); (c) 17 county inmates

---

[6]     To say that a person has tested positive is not to say, however, that the person has an active infection, is symptomatic, or is contagious. And of course, more testing will inevitably reveal more cases.

at a separate building, Delaney Hall (6 released); (d) 88 members of regular staff, 77 of whom have been quarantined, cleared and returned to work; and (e) 4 members of civilian staff, 3 of whom have been cleared and returned to work. (DE 18-1 at 16.)

   ii.    *Petitioner's Evidence Regarding the Conditions at ECCF*

Petitioner has provided a declaration regarding conditions at ECCF. (DE 1-2.) Generally, he states that the facility is "very cold" and that he is not being provided with portions of food "suitable for adult men." (*Id.* at 5–6.) He indicates that he has only been provided with two pairs of pants and two shirts and is only permitted to do laundry once a week. (*Id.* at 6.)

Petitioner states that he shares a cell with another individual. (DE 1-2 at 6–7.) Their beds are "very close together" and he is unable maintain six feet of distance between himself and his cellmate. (*Id.*) Petitioner states that he is also unable to socially distance himself from others within the housing unit as a whole. (*Id.* at 6.) The detainees "all have to eat in close quarters at round tables or at tables close together that are right next to our beds." (*Id.*) Petitioner states that, "[k]eeping six feet from other detainees is not possible in this small space that acts as a sleeping room, a kitchen, a dining room, a restroom, a gym, and a living room for the 37 people who live here." (*Id.* at 7.)

Petitioner is one of three individuals in his housing unit responsible for cleaning the communal bathrooms three times a day. (*Id.*) He states, however, that this is insufficient to keep the bathrooms clean. (*Id.*) He also states that he has not been given a mask to wear when cleaning these common areas. (*Id.*)

Petitioner indicates that detainees are afraid to report their symptoms because the quarantine area is "essentially solitary confinement." (*Id.*) He states there are "probably about 12

people" who have symptoms consistent with COVID-19 but do not want to inform the staff because they are afraid of dying alone in quarantine. (*Id.*)

To further describe the conditions at ECCF, Petitioner also provides the declarations of two attorneys who represent clients detained at ECCF and have visited the facility. (DE 1-8; DE 1-9; DE 14-3.)[7] Both attorneys indicate that detainees are unable to stay six feet away from one another. (DE 14-3 at 3; DE 1- at 7.) Detainees continue to eat together at common tables which have "immovable attached seating" which forces them to be sit in proximity to one another. (DE 14-3 at 3.) Detainees, they say, have told them that "soap is scarce," despite ECCF officials' statements to the contrary. (DE 14-3 at 5; DE 1-9 at 5.) Detainees also report an inability to access cleaning supplies and state that the facility is not being regularly cleaned. (DE 14-3 at 5; DE 1-9 at 5.)[8]

---

[7]     One attorney visited ECCF as recently as May 1, 2020, but it is unclear when the second attorney last visited the facility. (DE 14-3; DE 1-8.) A court may consider a hearsay affidavit, as opposed to live testimony, in connection with a TRO or preliminary injunction application. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004).

[8]     Judge Arleo has noted that conditions at ECCF (although not, apparently, the ICE unit in particular) were far from ideal even before the COVID-19 crisis arose:

> The Court also notes that the Office of the Inspector General ("OIG") of DHS has documented safety issues at ECCF prior to the COVID-19 outbreak. In February 2019, OIG "identified serious issues relating to safety, security, and environmental health" at ECCF, including "serious concerns about the facility's ability to handle security issues"; "concerns about food, particularly meat, which was raw, spoiled, or expired"; and "leaking ceilings in detainee living areas, showers laced with mold and peeling paint, and dilapidated beds." Office of the Inspector Gen., Dep't of Homeland Sec., Issues Requiring Action at the Essex County Correctional Facility in Newark, New Jersey (Feb. 13, 2019), at 2–4, 7. "Based on the substandard food safety and sanitation practices we observed," the OIG concluded, "ICE cannot ensure detainee health at the Essex Facility." Id. at 6. The OIG conducted a follow up visit to ECCF in June 2019, and noted that the food safety situation remained "egregious" at ECCF, and that "mold permeated all walls in the bathroom area, including ceilings, vents, mirrors, and shower stalls" which "present health risks." Office of the Inspector Gen., Dep't of Homeland Sec., Concerns about ICE Treatment and Care at Four Detention Facilities (June 3, 2019), at 4, 8.

*Jose B.R. v. Tsoukaris*, Civ. No. 20-3347, 2020 WL 2744586, at *6 n.22 (D.N.J. May 27, 2020).

These general reports, however, do not necessarily reflect current conditions, and do not in all respects correspond to the conditions that Petitioner himself says he is experiencing.

## III.   JURISDICTION

Respondents raise the threshold question of whether this Court has jurisdiction to entertain this petition and motion. (DE 13 at 19–23.) Third Circuit case law, in their view, does not permit conditions of confinement claims to be raised through a § 2241 petition. (*Id.* at 20.) Respondents add that even if this Court did have jurisdiction, release would not be the proper remedy. (*Id.* at 23–24.) Petitioner contends, however, that he is challenging the *fact* of his detention; a claim which is the proper subject of a § 2241 petition. (DE 14 at 5.) He asserts that release, only obtainable *via* a habeas petition, is the only remedy for his constitutional injury. (*Id.*)

Historically, conditions of confinement claims have been brought pursuant to 42 U.S.C. § 1983, seeking damages or amelioration of those conditions by injunction. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he is asserting a remedy available through a habeas petition. *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973); *see also Camacho Lopez*, 2020 WL 1689874, at *4 ("[Petitioner] seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life. This is unequivocally a habeas remedy.") A habeas petition is the process by which an individual may challenge the "fact or length" of his confinement. *See Preiser*, 411 U.S. at 494. To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*,  137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell*

12

*v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have permitted such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 n.5, 242–44 (3d Cir. 2005); *Jiminian v. Nash*, 245 F.3d 144, 146–47 (2d Cir. 2001); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978); *Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977). Recent case law within this circuit has been fairly consistent in holding that an immigration detainee may challenge the conditions of his confinement through a § 2241 petition. *See Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Within this emerging case law, several district courts have also granted release, in the form of temporary restraining orders or preliminary injunctions, to immigration detainees whose conditions of confinement were found to be unduly punitive in light of their medical conditions. *See Jose B.R.*, 2020 WL 2744586, at *12; *Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616 (D.N.J. Apr. 12, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Castillo v. Barr*, Civ. No. 20-605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, Civ. No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (frequently cited as the leading case). Given these considerations, I agree with the line of cases that have permitted

conditions of confinement claims to proceed through a habeas petition. Accordingly, I find that this Court has jurisdiction over this habeas action.[9]

## IV.    LEGAL STANDARD

### A.    Temporary Restraining Order

In addition to his habeas petition, Petitioner has also filed a motion for a TRO. (DE 3.) Injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted). In order to obtain a TRO, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . If these gateway factors are met, a court then considers the remaining two factors and

---

[9]      Jurisdiction is properly laid in this District Court, because Petitioner is detained within this district and alleges that his detention violates the Constitution. With exceptions not relevant here, a petitioner may seek § 2241 relief only in the district wherein he or she is held in custody. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *see also United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009) (reviewing case law requiring filing in district of confinement); *Gutierrez v. Gonzales*, 125 F. App'x 406, 412 (3d Cir. 2005) (surveying territorial custody requirement in relation to ICE detainees who were removed). That jurisdictional/territorial requirement flows naturally from the nature of a habeas petition, which is directed to the petitioner's custodian and alleges that the custodian is holding the petitioner in violation of the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.") (citations omitted); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, the strength of a claim on the merits is in a kind of resonance with the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

**B.     "Extraordinary Circumstances" Test for Bail**

In his motion for a TRO, Petitioner cites the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986), which held that a habeas petitioner may be eligible for bail prior to ruling on the merits of his petition under "extraordinary circumstances." *See id.* at 367. The Third Circuit held that this standard reflected "the recognition that a preliminary grant of bail is an exceptional form of relief in a habeas corpus proceeding." *See id.* The Court cited as an example of extraordinary circumstances its prior decision in *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), where a petitioner who was "gravely ill" and required hospitalization was granted bail pending his habeas petition. *See id.* The Third Circuit in *Lucas* expressly clarified that a petitioner's poor health was not the only "extraordinary circumstance" that would justify a grant of bail. The Third Circuit reaffirmed this "extraordinary circumstance" test in its later opinions in *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) and *In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).  Recent decisions within this district have been guided by the *Lucas* standard in addressing whether "extraordinary circumstances" exist to grant bail to ICE detainees seeking habeas relief

during the COVID-19 pandemic. *See Cristian A.R.*, 2020 WL 2092616, at *13; *Rafael L.O.*, 2020 WL 1808843, at *5.

## V.    DISCUSSION

Petitioner raises a single claim: that his continued detention at ECCF violates his substantive due process rights under the Fifth Amendment. (DE 1 at 32–33.) Petitioner submits that his conditions of confinement are unconstitutionally punitive, taking into account his medical condition and the conditions at ECCF. (*Id.*) Based upon the particular circumstances presented in this case, I find that Petitioner has not met the standard for a TRO or release on bail.

### A.    Temporary Restraining Order

#### i.    *Likelihood of Success on the Merits*

Respondents argue that Petitioner's conditions of confinement claim is unlikely to succeed in light of the significant measures ECCF has taken to prevent the spread of COVID-19. (DE 13 at 25.)[10] Respondents also argue that Petitioner's continued detention is not excessive in relation to its purpose because Petitioner is subject to an INTERPOL Red Notice and "there is good reason to believe that Petitioner will be a danger to his community." (*Id.* at 29.) Petitioner asserts that, despite Respondents' efforts, the conditions at ECCF still amount to punishment because he is

---

[10]    Respondents also submit that Petitioner is lawfully detained pursuant to 8 U.S.C. § 1226(a) and that he has not exhausted his available administrative remedies. (DE 13 at 24–25.) However, Petitioner is raising a due process challenge to the *conditions* of his confinement and not a challenge to the government's authority to detain him. The fact that Petitioner is subject to detention does not negate his argument that the conditions of his confinement may be unconstitutional. *See E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019) (holding that immigration detainees are entitled to the same due process protections as pretrial detainees and delineating the applicable legal standard for a detainee's conditions of confinement claim). Moreover, "due process claims generally are exempt from the exhaustion requirement because the [Board of Immigration Appeals] does not have jurisdiction to adjudicate constitutional issues." *Tjioe v. Attorney Gen. of U.S.*, 257 F. App'x 581, 584 (3d Cir. 2007) (quoting *Bonhometre v. Gonzales*, 414 F.3d 442, 448 n.7 (3d Cir. 2005)); *see also Sewak v. INS*, 900 F.2d 667, 670 (3d Cir. 1990). Thus, since Petitioner is raising a Fifth Amendment due process claim in his petition, he is "exempt" from the exhaustion requirement.

unable to engage in social distancing or necessary hygiene practices. (DE 14 at 6–7.) These shortcomings, he says, leave a person with his medical conditions at an elevated risk of contracting a severe case of COVID-19. (*Id.* at 7.)

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Consistent with due process, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a challenged condition amounts to punishment, a court will consider whether it "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Conditions of confinement are "reasonably related" to a legitimate government objective if they serve a legitimate purpose and be rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A challenged condition may amount to impermissible punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," or if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

The COVID-19 pandemic is too recent to have produced definitive guidance from the United States Supreme Court or the United States Court of Appeals for the Third Circuit regarding conditions of confinement claims. Some principles have emerged from the case law in this district,

however. In general, whether an immigration detainee's conditions of confinement amount to punishment will depend primarily on the detainee's health and the specific conditions at the detention facility. *See Cristian R.*, 2020 WL 2029336, at *2*; Thakker*, 2020 WL 2025384, at *8; *Rafael L.O.*, 2020 WL 1808843, at *7–8. Results have varied depending on the facts of the case; "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R.*, 2020 WL 2029336, at *2.

Judge Vazquez has contributed a useful tripartite classification of cases:

> (1) detainees who do not fall into a particularly vulnerable category;
>
> (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and
>
> (3) detainees who have tested positive for COVID-19.

*Romeo S.K. v. Tsoukaris*, Civ. No. 20-5512, 2020 WL 2537647, at *5 (D.N.J. May 18, 2020) (line breaks added). The petitions of detainees in the first category (no particular risk factors), Judge Vazquez states, have generally been denied. Those in the second category (prisoners with risk factors) have been granted or denied depending on the circumstances—especially, the severity of the risk and whether the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by available conditions of release. For those in the third category – detainees who have the virus – the critical question becomes, in Judge Vazquez's view, not release as such, but whether the detainee is receiving prompt and adequate care. *Id.*

Respondents urge the Court to follow recent cases which have denied requests for release by detainees at ECCF. (DE 13 at 26–27.) Respondents correctly note that some decisions have found that conditions at ECCF do not amount to punishment given the measures ECCF has

implemented and the petitioner's individual circumstances. I cite two recent examples: *Richard A. S. v. Tsoukaris*, Civ. No. 20-4612, 2020 WL 2487645, at *4 (D.N.J. May 14, 2020) (noting that Petitioner detained at ECCF had already once been released on bail, but was rearrested for assaulting his step-daughter and reincarcerated, that his lung condition dated from 2014 with no significant current manifestations, and other factors); *Romeo S.K. v. Tsoukaris*, Civ. No. 20-5512, 2020 WL 2537647 (D.N.J. May 18, 2020) (noting that ECCF had been attentive to Petitioner's diabetes and hypertension, but that he had declined to comply with medical directives, that he had a serious criminal history and history of dishonesty with immigration officials, and that there were not adequate conditions of release that would satisfy the government's legitimate interests).

Other cases within this district, however, including at least one of my own, have ordered release on conditions. These cases have held that the conditions at ECCF, under the petitioner's individual circumstances, do amount to punishment. Again, I cite two recent examples: *Jose B.R.*, 2020 WL 2744586, at *12 (noting 18-month detention pending removal based on nonviolent burglary offense, deteriorating schizophrenia-spectrum disorder, immigration court closures, inability to practice hygiene or social distancing, availability of adequate conditions of release); and *Juan E. M. v. Decker*, Civ. No. 20-4594, 2020 WL 2214586, at *8 (D.N.J. May 7, 2020) (noting obesity, smoking, critically low oxygen saturation level of 88%, minor criminal history, and availability of adequate conditions of release).

These disparate rulings only underscore that the issue is highly fact-sensitive and particular to the individual. *See Umarbaev v. Lowe*, Civ. No. 20-413, 2020 WL 1814157, at *7 (M.D. Pa. Apr. 9, 2020). Thus "[t]he success of each petition will depend not only on the circumstances of the petitioner before the Court, but also on a rapidly changing landscape that includes the state of

the COVID-19 pandemic, current conditions in ICE facilities, and the evolving response by ICE and facility officials to medical needs." *Id.*

Here, Petitioner's likelihood of success on the merits of his conditions of confinement claim presents a mixed picture. He is 46 years old, and therefore not in a high risk age group. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 8, 2020) According to the medical opinion evidence Petitioner has submitted, however, substantial medical evidence "demonstrates that diabetes is a significant risk factor for developing severe illness or even dying as a result of COVID-19." (DE 1-4 at 5.) The affiant cites CDC guidance, listing diabetes as one of several high-risk "underlying medical conditions particularly if not well controlled." (DE 1-4 at 5–6 (citing Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 22, 2020).)

Petitioner has submitted undisputed evidence that in February he was diagnosed with type-2 diabetes, diabetic neuropathy, and hyperlipidemia. (DE 14 at 7; DE 1-4 at 5–6; DE 13 at 17.) Respondents, citing ECCF medical, confirm the diagnoses of type-2 diabetes, diabetic neuropathy, and hyperlipidemia. (DE 13 at 17.) The same records indicate, however, that Petitioner's health is thoroughly and regularly evaluated and that he is receiving appropriate medical attention. In response to Petitioner's complaints, appropriate laboratory work was done, leading to the diabetes diagnosis, a brief hospital visit, and the prescribing of appropriate medication. (DE-2 at 43–47, 61, 65, 67, 70, 73.) Petitioner has received regular care and monitoring, apparently daily, of his blood glucose levels. As of March 19, 2020, "overall great improvement" was noted, and he was taken

off of one of the medications. (*Id.* at 101.) In short, it appears that Petitioner's diabetes is being treated appropriately.

There is evidentiary support for Petitioner's claim that he has a medical condition that may render him more vulnerable than the average person to serious complications from a COVID-19 infection. The source Petitioner cites, however, identifies diabetes as a high risk "particularly if poorly managed." (DE 1-4 at 5.) But, there is no evidence here that Petitioner's condition is "poorly managed" or that his medical needs are being neglected.

Petitioner tested positive for IgM/IgG antibodies, was quarantined for two weeks, and released back into the general population. ECCF's medical director cautiously acknowledges that it "may be" the case that Petitioner has developed or is developing COVID immunity. (DE 13-6 at 6.) Thus, he does not really disagree with Petitioner's medical opinion evidence that rapid antibody testing, although a useful research tool, does not necessarily yield reliable clinical findings for these purposes. Although it may be a source of encouragement, I cannot give this factor significant weight.

There is no doubt that close quarters, such as jails, provide increased opportunity for infection. Thankfully, after an initial surge, peaking in April, infections trends are down, in New Jersey, in Essex County, and in the ECCF itself.

Respondent has submitted significant evidence that—after an inevitable catch-up period—ECCF has implemented protocols to minimize and contain infection. (*See* pp. 7–9, *supra*, for more detail.) Although bunk beds in the individual cells (spaced around the housing unit) are close together, the central area of the housing unit has sufficient space. The method of serving meals has changed; they are now furnished to detainees in their cells or the recreation area. Smaller groups

are permitted to take recreation simultaneously. The detainees have been educated as to sanitary practices.

ECCF has hired additional staff to clean, and the detainees, too, have been enlisted so that cells and common areas are sanitized frequently. Detainees have free access to soap and are encouraged to use it.[11] Access to disinfectant agents is controlled, for safety reasons, but it is available.

Medical care complies with CDC guidelines. Surgical masks are issued, not to everyone, but to those with symptoms suggesting COVID-19. Those with moderate to severe symptoms are sent to the hospital; those with mild symptoms are quarantined. Symptomatic persons are immediately placed on anti-viral medications and their vitals are monitored daily. Detainees who may have been exposed to a confirmed case are "cohorted" for fourteen days to prevent any further spread. Detainees with health conditions identified by the CDC as high risk are housed separately; individuals with "well-controlled" chronic conditions, however, remain in general population. Staff members are provided with a surgical mask and gloves when they report to work. ECCF is in the process of testing the entire inmate and detainee population and housing them accordingly.

One caveat is that rapid testing antibody screening is an imperfect measure. Another is provided by Petitioner's evidence that, despite Respondents' best efforts, there are "gaps in the Facility's protocols." *See Jose B.R.*, 2020 WL 2744586, at *6. Petitioner and another individual share a cell which, as Director Ortiz acknowledges, does not permit them to remain six feet apart. (DE 1-2 at 6–7; DE 15-1 at 2.) Director Ortiz's declaration confirms Petitioner's statement that

---

[11]     An outside observer from Legal Services of New Jersey who interviewed detainees suggests that access to soap is limited to one bar per week. Her information, much of it secondhand, dates from May 1, 2020. It is unclear how much of it relates to ICE detainees specifically. Much of what she describes—for example, alleged denial of medication and medical care—is clearly incorrect with respect to this Petitioner. (DE 14-3.) Director Ortiz has offered specific evidence in rebuttal to these generalities, demonstrating that there is a plentiful supply, with inventory figures. (DE 15-1.)

detainees are not routinely provided with face masks unless they exhibit COVID symptoms. That falls short of CDC guidance, which recommends that "everyone should wear a cloth face cover when they have to go out in public" in order to prevent the spread of the virus. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 8, 2020). Director Ortiz states generally that detainees assigned to perform cleaning tasks are provided with masks and gloves, but Petitioner denies that he specifically has received a mask, and I will for present purposes credit his version.[12] (*Compare* DE 15-1 at 10–11; DE 1-2 at 7.)

Despite ECCF's best intentions and efforts under trying circumstances, complete safety is unattained and indeed unattainable. To date, there is no vaccine for COVID-19; preventive measures are the only option. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 8, 2020). While Respondents have presented evidence of great efforts to thwart the spread of COVID-19, some risk of infection remains. I therefore weigh Petitioner's vulnerability against that irreducible risk, and in light of the government's legitimate interests in continued detention.

The government has a legitimate interest in preventing Petitioner from absconding, enforcing immigration laws, and protecting the public. Respondents state that the INTERPOL Red Notice provides "good reason to believe" that Petitioner will be a danger to the community. It is true, as Petitioner states, that a Red Notice is not itself a conviction or a warrant; it is a "wanted persons" notification for the use of law enforcement, issued at the request of a member country.

---

[12]   I understand the purpose—*i.e.,* lack of protective equipment— for which this allegation is being brought to my attention. This contention is, however, in some tension with more general statements in the affidavits submitted by Petitioner to the effect that cleaning is not being done. Apparently, Petitioner is one of the persons doing it.

*See* INTERPOL, *Red Notices*, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited June 8, 2020). The notice itself, however, recites that on November 23, 2015, a warrant was issued for Petitioner's arrest on the charge of aggravated rape of a minor in Guatemala. The crime was allegedly committed on October 31, 2015 (DE 13-8), and it was just four days later that the Petitioner was admitted to the United States, raising a permissible inference of flight. That said, the Petitioner maintains that the accusation against him was probably brought in bad faith by "corrupt officials" whom he had angered. (DE 14-2 at 2.) The ICE detention itself is not based on criminal activity, but on the Petitioner's having overstayed his tourist visa.

On balance—weighing the preventive measures taken by ECCF, trends in the infection rates at ECCF, the well-controlled and chronic nature of Petitioner's medical condition, and the legitimate interests of the government—I do not find that Petitioner's present circumstances are excessive in relation to the purpose of his detention.

>        ii.    *Irreparable Harm*

No one disputes that contracting the COVID-19 illness would constitute a harm that meets the irreparable harm requirement. Respondents at least imply that COVID-19 may no longer pose a threat to Petitioner because his antibody test results came back as positive for the presence of IgM and IgG antibodies. (DE 13 at 32.)  Respondents also argue that Petitioner cannot demonstrate irreparable harm because he has not made a record that, if released, he will be living in a place that is safer than his current environment. (*Id.* at 31–32.)

Petitioner, for the reasons stated above, disputes the inference that he is now immune. As I have already explained, I accept that the rapid antibody test is far from conclusive. Moreover, the science is not yet clear as to whether, even if a person has been exposed, the person thereby

gains immunity. (*See* DE 14 at 12; DE 1-15 at 6.) Accordingly, COVID-19 infection cannot be discounted as a danger to this Petitioner.

Respondent's second argument is weightier. Petitioner asserts that he "will be safer if released." (DE 14 at 12.) Yet he does not provide evidence of *how* he will be safer if released. Petitioner does not specify where he would reside if released. He suggests that a shelter may be "one option," but does not establish that such a group setting would be safer than ECCF. He does not establish that such accommodations would provide him the ability to socially distance, or afford him treatment for his diabetes, which he now has. (*Id.*) There is no guarantee against contracting COVID-19, even in the community at large, and Petitioner has not demonstrated that he will be better able to adhere to CDC guidelines if released from ECCF.

Based upon the record presently before the Court, Petitioner has not shown that he is more likely than not to suffer the irreparable harm of contracting the COVID-19 illness if his detention continues.

### iii.    Balancing of the Equities

Having found that Petitioner has not met the two "most critical" factors – likelihood of success on the merits and irreparable harm – I need not address the remaining two factors, the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. *See Reilly*, 858 F.3d at 176, 179; *Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *13 (D.N.J. Apr. 28, 2020). The prior discussion, however, largely disposes of those considerations as well.

## B.    Extraordinary Circumstances Warranting Bail

Petitioner invokes the more general "extraordinary circumstances" standard for grant of bail pending resolution of a habeas petition. (DE 3-1 at 31–34.) For the same reasons I have found

injunctive relief inappropriate, I find that the circumstances are not so extraordinary as to justify a release on bail.

## VI.    CONCLUSION

For the foregoing reasons, the petition (DE 1) and motion for a TRO (DE 3) are denied.

An appropriate Order accompanies this Opinion.

DATED: August 21, 2020

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge